IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COVENANT REALTY**, <br><br> Plaintiff, <br><br> *v*. <br><br> **WESTMINSTER AMERICAN INSURANCE COMPANY**, <br><br> Defendant. | **CIVIL ACTION** <br><br><br> **NO. 2:20-cv-00301-KSM** |

<u>MEMORANDUM</u>

**MARSTON, J.**                                                                                              **October 26, 2021**

Plaintiff Covenant Realty brings this insurance contract action against Defendant Westminster American Insurance Company.  Covenant alleges that Westminster, in bad faith, breached its contractual obligations by failing to cover the damage caused by the collapse of a glass skylight atrium at Covenant's property in Pottstown, Pennsylvania.  Presently before the Court is Westminster's motion for summary judgment.  For the reasons discussed below, Westminster's motion is granted in part and denied in part.

**I.      Factual Background**

Viewing the evidence in the light most favorable to Covenant, the relevant facts are as follows.

   *A.      The Insurance Policy*

Westminster issued a Business Owner's Special Policy (the "Policy") to Covenant, insuring Covenant's four-story apartment building located at 101 East High Street in Pottstown,

1

in the amount of $3,700,000.  (*See* Doc. No. 19-12.)  The Policy includes several exclusions from coverage, one of which is relevant here.

Pursuant to Additional Exclusion 2, the Policy "do[es] not pay for loss or damage involving collapse, caving in, or impairment of structural integrity, including but not limited to sagging, bowing, bending, leaning, separation of parts of the property, or inadequacy of load bearing capacity."  (*Id.* at 31.)  This exclusion does not apply where the loss results from a "specified peril[]," such as a "windstorm."  (*Id.* at 11, 31.)

Although the Policy specifically excludes collapses, it includes an "Additional Coverage of Collapse" provision, which covers "loss or damage to covered property caused by the sudden and abrupt collapse of a covered building or a portion of a covered building . . . caused by hidden decay of a structural component of the building or structure, unless an 'insured' knew of or could reasonably be expected to suspect the presence of such decay prior to the sudden and abrupt collapse."  (*Id.* at 15.)

B.   *The Collapse*

Covenant's apartment building has a glass skylight atrium on its roof.  (Doc. No. 19-10 at 15.)  Late in the evening of July 9 or early in the morning of July 10, 2019,[1] the atrium collapsed (the "Collapse"), leaving a hole in the roof and causing glass and other debris to fall into the building's elevator vestibule.  (Doc. No. 1, Ex. A at 9 ¶ 4.)  On the night of the Collapse, the

---

[1] Covenant's Complaint asserts that the Collapse occurred "on or about 7/10/2019" (Doc. No. 1, Ex. A at 9 ¶ 4); however, in its response to Westminster's motion for summary judgment, Covenant claims there is "uncertainty as to what the specific time it occurred over July 10-11." (Doc. No. 21 at 2 ¶ 1.)  Westminster offers a facsimile cover sheet that shows Covenant's claim was submitted on July 10, 2019 at 5:35 p.m.  (Doc. 22-1 at 2–5.)  Given this undisputed evidence regarding the timing of the loss claim, Covenant conceded during oral argument that the loss occurred on the evening of July 9 or early in the morning of July 10.  (Doc. No. 33 at 51 ("[I]t seems like we would be pretty consistently on [July] 10th.").)

building's supervisor called Covenant's owner and alerted him that "the atrium roof fell and the water is pouring into the building." (Doc. No. 19-10 at 14.)  The Collapse resulted in tens of thousands of dollars in damage to the interior, atrium, and rooftop of the building. (Doc. No. 1, Ex. A at 15–50.)  Immediately following the Collapse, Covenant submitted a notice of loss claim to Westminster. (Doc. No. 22-1 at 2–5, Doc. No. 33 at 50–51.)

      C.     *Investigation into the Collapse*

Shortly after the Collapse, Covenant retained a public adjuster, Stephen Figlin, to investigate its cause and assist with the claims-submission process. (Doc. No. 21 at 102–03.)  Upon receipt of Covenant's claim, Westminster also retained an adjuster, Eric Schuster, and a structural engineer, Robert Hoffman, to conduct its own investigation of the cause of the Collapse.[2]  (*See* Doc. Nos. 19-6, 19-7.)  Following their respective investigations, Figlin, Schuster, and Hoffman came to differing conclusions as to the cause of the Collapse. (*See* Docs No. 19-6, 19-7, 19-13.)

          1.     *Storm Damage*

Covenant's notice of claim stated that the atrium collapsed "due to the heavy rain." (Doc. No. 19-5 at 2.)  However, weather reports from the National Oceanic and Atmospheric Association ("NOAA") show no record of rain and a peak wind speed of twenty-one miles per hour at the time of the Collapse. (Doc. No. 21 at 31–32.)  Despite the lack of recorded rain or winds exceeding twenty-one miles per hour, Covenant's owner testified that, on the night of the Collapse, the building's superintendent called him reporting "very strong wind and rain and [that

---

[2] Within days of receiving the claim, Westminster started its inspection of the apartment building. Westminster's experts inspected the building on more than one occasion. (*See* Doc. No. 19-6 at 2 (indicating that Westminster's adjuster inspected the building on July 16 and July 30, 2019); Doc. No. 19-7 at 2 (indicating that Westminster's engineer inspected the building on July 16 and July 19, 2019).)

the atrium] collapsed." (Doc. No. 19-10 at 26.) Covenant's owner also testified that, at the time of the Collapse, "in Pottstown . . . it was raining and the wind was strong." (*Id.* at 27.) Likewise, Covenant's adjuster testified, "It's my belief and my opinion that [a] windstorm contributed to the severe damage to the roof atrium system . . . ." (Doc. No. 21 at 111.)

In contrast, Westminster's adjuster concluded that heavy winds and rain could not have caused the Collapse. He explained, "The glass panels were sloped and designed to drain rain/precipitation directly off of it onto the flat roof system and away from the glass/steel" so "water could and would not collect on this system." (Doc. No. 19-6 at 2.) Westminster's structural engineer also found that the structure of the atrium was such that heavy rain and high winds could not have caused the Collapse: "The A-frame roof construction design promotes drainage of water off of the [atrium]" such that "[w]ater would not accumulate on the structure resulting in an increased load. The failure of the structure was not the result of a one-time weather-related event." (Doc. No. 19-7 at 5.)

        2.     *Wear and Tear*

Both parties agree that the Collapse was caused, at least to a degree, by decay, deterioration, and rot within the atrium, but the parties disagree as to whether that decay was hidden. (Doc. No. 19-2 at 11, Doc. No. 21 at 24–25.)

Covenant claims it was not aware of decay in the atrium prior to the Collapse. (Doc. No. 21 at 11.) At several points before the Collapse, the glass panels atop the atrium cracked, causing water to leak into the interior of the building. (Doc. No. 19-10 at 15.) Covenant's maintenance crew replaced the glass panels, and Covenant was not aware of any issues with leaks through the atrium following these repairs. (*Id.* at 15–16.) Just a few months prior to the

Collapse, Covenant's owner was on the roof of the building and did not "identify any problems or issues that needed to be dealt with." (*Id.* at 17.)

Westminster's adjuster and engineer disagree—they both uncovered signs of wear and tear around the atrium, which they claim would have been visible before the Collapse. On his initial investigation following the Collapse, Westminster's adjuster observed "visible wear/tear/rust/corrosion/deterioration to the steel frame and all wood frame components surrounding and supporting the [atrium]." (Doc. No. 19-6 at 3.) Similarly, Westminster's structural engineer found that the atrium roof "exhibited signs of deterioration" and that "the remaining metal track [was] corroded." (Doc. No. 19-7 at 3.) Photographs that Westminster's adjuster and engineer took after the Collapse show wet rot, dry rot, brick corrosion, deterioration, and decay in and around the atrium area of the roof. (Doc. Nos. 19-6, 19-7.) Westminster's adjuster and engineer also found that the roof was covered in roofing mastic.[3] (Doc. No. 19-7 at 4.) Westminster argues the fact Covenant used mastic proves Covenant knew the roof was deteriorating. (Doc. No. 19-11 at 2.)

Covenant's adjuster counters that, even though there may have been visible signs of wear and tear *following* the Collapse, *prior* to the collapse, the wear and tear would not have been visible through Covenant's "natural, normal routine of checking the building." (Doc. No. 21 at 56.) He also opined that before the Collapse, the deterioration reflected in the post-Collapse photographs "would [not] have been recognizable from below because of the interior ceiling glass obscuring an upward view of the atrium roof and its structural elements." (Doc. No. 19-13 at 2.)

---

[3] Roofing mastic is a cement-like product used to seal a roof to prevent water penetration.

5

### D. *Denial of the Claim*

On October 3, 2019, Westminster denied Covenant's claim due to "rot, wear[,] tear, deterioration and maintenance related issues," all of which were excluded from Covenant's policy. (Doc. No. 19-11 at 2.) Specifically, Westminster stated that the "evidence of deterioration . . . would have been known to [Covenant] based on multiple layers of roof mastic that w[ere] applied to the roof" and "rust on the metal framing holding the glass and the wood supports attached to the brick." (*Id.*)

On October 7, 2019, Figlin replied on behalf of Covenant. (Doc. No. 19-13.) He pointed Westminster to the Policy's Additional Coverage for Collapse provision, arguing that the "application of roof mastic may be evidence of either maintenance or preventative maintenance applied for the proper upkeep," and explained that the deterioration had been hidden and was only revealed after the Collapse. (*Id.* at 2.)

In response on October 10, Westminster confirmed its denial of coverage based on its determination that the Collapse "was caused by decay which the insured knew of or could reasonably be expected to suspect the presence of prior to the collapse." (Doc. No. 19-14.)

## II. Procedural History

Following Westminster's second denial of coverage, on December 31, 2019, Covenant commenced this suit in the Court of Common Pleas in Philadelphia County, asserting a breach of contract claim and a bad faith claim in violation of 42 Pa. Stat. and Cons. Stat. § 8371. (Doc. No. 1, Ex. A.) Westminster then removed the case to this Court. (Doc. No. 1.)

At the end of fact discovery, Westminster moved for summary judgment on both counts. (Doc. No. 19.) First, Westminster argues that the terms of the Policy do not provide coverage because the undisputed evidence shows that the Collapse was not caused by a covered peril, *i.e.*,

a windstorm. Second, Westminster argues that the loss was caused by rot, wear, tear, and/or deterioration of the atrium and that Covenant knew or at least could reasonably be expected to suspect that this rot, wear, tear, and/or deterioration existed prior to the collapse of the atrium, and therefore is not covered by the Policy's additional coverage provisions. (*Id.*) Last, Westminster argues that it conducted a good faith investigation as to the cause of Covenant's loss, and therefore, the bad faith claim fails. (Doc. No. 19-2 at 2.) Covenant opposes the motion. (Doc. No. 21.) The Court held oral argument on the motion on October 14, 2021. (Doc. No. 33.)

**III.     Standard of Review**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249. At "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

**IV.    Discussion**

Westminster argues that summary judgment is warranted because Covenant is not able to show that it is entitled to coverage under the Policy nor is it able to show that Westminster denied Covenant's claim in bad faith.  The Court discusses each claim in turn.

   *A.    Breach of Contract Claim*

To establish a breach of an insurance contract claim, it is necessary "for the insured to show a claim within the coverage provided by the policy." *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966) (quoting *Warner v. Emp'rs' Liab. Assurance Corp.*, 133 A.2d 231, 233 (Pa. 1957)).  Here, the Policy excludes coverage for collapses, but it covers collapses caused by a "specified peril," such as a windstorm.  (Doc. No. 19-12 at 11, 31.)  The Policy also includes additional coverage for collapses, so long as the collapses are a result of "*hidden decay* of a structural component." (*Id.* at 15 (emphasis added).)  Covenant argues that the Collapse is covered under the Policy because it was caused by either (1) a windstorm or (2) hidden decay.

   *1.    The Windstorm*

Covenant contends that the Collapse was the result of high winds and heavy rains from a storm that swept through the Philadelphia area on or about July 11, 2019.  (Doc. No. 21 at 104 (stating that the Collapse "appears to have occurred after midnight and thus actually happened on July 11, 2019").)  To support this argument, Covenant points to NOAA reports showing that there were winds nearing forty miles per hour on July 11.  (*Id.* at 31.)

But as Covenant conceded at oral argument, the record is clear—the Collapse *could not* have occurred on the evening of July 10 or early in the morning on July 11 (*see* Doc. No. 33 at 51) because Covenant submitted its notice of claim before the close of the business day *on July 10* (*see* Doc. No. 22-1 at 2).  The NOAA reports upon which Covenant relies show that, on July

9 and 10, there was no rain and winds were no greater than approximately twenty miles per hour.[4]  (Doc. No. 21 at 31.)

And, even assuming there had been heavy rain and strong winds on the night of the Collapse, Covenant fails to show that the rain and winds *caused* the atrium to collapse.  Both Westminster's adjuster and engineer found that the A-frame design of the atrium promoted drainage and would have prevented water from pooling on the roof of the atrium and causing the Collapse.  (Doc. No. 19-6 at 2, Doc. No. 19-7 at 5.)  Covenant's adjuster offers only conclusory testimony that "a severe windstorm had struck the area, causing damage to the roof atrium system," but fails to point to any facts in support of this conclusion.  (Doc. No. 21 at 108.)  Covenant has not produced any other evidence that a storm caused the Collapse.

Covenant's adjuster's unfounded conclusions do not create a genuine issue of material fact as to whether a storm could have caused the Collapse.  *See Marvel v. Delaware County*, No. 07-cv-5054, 2009 WL 1544928, at *17 (E.D. Pa. June 2, 2009) (granting defendant's motion for summary judgment where plaintiff's expert report proffered to prove causation included only "conclusory opinions without explicit factual foundation" (internal citations and quotations omitted)); *see also Abran v. City of Philadelphia*, No. 18-cv-1107, 2020 WL 6781938, at *14 (E.D. Pa. Nov. 17, 2020) ("[C]onclusory allegations . . . cannot defeat summary judgment.").  Accordingly, Covenant is unable to show that the Collapse is covered by the Policy's windstorm exception, so the Court grants Westminster's motion as to this exception.

---

[4] Even if the record supported Covenant's assertion that the Collapse occurred on the evening of July 10 or the early morning of July 11, the NOAA reports do not show any rain then, either.

9

*2. Hidden Decay*

Next, Covenant argues that, even if the Collapse was not caused by a windstorm, there is a genuine issue of material fact as to whether the Collapse was caused by hidden decay. (Doc. No. 21 at 22.) The Court agrees.

Covenant's owner testified that his employees regularly maintain the roof and that he himself was on the roof just a few months prior to the Collapse and did not see any signs of decay or deterioration. (Doc. No. 19-10 at 15–17.) He also testified that the decay was not visible through his "natural, normal routine of checking the building." (*Id.* at 22–23.)

Although Westminster's adjuster and engineer took photographs showing dry and wet rot, decay, rust, deterioration, and wear and tear in and around the atrium (Doc. Nos. 19-6 at 5–97, 19-7 at 7–19), which they contend show that the decay was not hidden (Doc. No. 19-11 at 2), these photographs were taken *after* the Collapse. As such, these photographs fail to demonstrate what degree of decay was visible *prior to* the Collapse.

Westminster's experts also attempt to point to the application of large amounts of roofing mastic on the roof of the building as a sign that Covenant was aware the building's roof, including the atrium, was in disrepair. (*Id.*) Covenant, however, states that the roofing mastic was applied for remedial and/or preventative maintenance and does not demonstrate that Covenant knew of or could reasonably be expected to suspect the presence of such decay. (Doc. No. 19-13 at 2.)

Because there is a genuine issue of material fact as to whether the decay that caused the Collapse was hidden, the Court denies Westminster's motion for summary judgment as to the breach of contract claim with respect to whether the additional coverage for collapse applies.

B.     *Bad Faith*

Westminster also seeks summary judgment as to Covenant's bad faith claim.  To establish a claim for bad faith denial of insurance coverage under Pennsylvania law, a plaintiff must show with clear and convincing evidence: "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis."  *Smith v. Continental Cas. Co.*, 347 F. App'x 812, 815 (3d Cir. 2009) (internal citations omitted).

Covenant argues that there is a genuine issue of whether bad faith exists given Westminster's "actions throughout this entire process, including its failure to appropriately investigate and denying this loss despite no evidence that the damage was not hidden."  (Doc. No. 21 at 28.)  The Court disagrees.

Westminster immediately conducted an investigation into the cause of the Collapse, hiring two professionals, an adjuster and a structural engineer.  (Doc. Nos. 19-6, 19-7.)  They both found evidence that Covenant knew or should have known of the decay for several reasons: the post-Collapse photographs showed visible rust, rot, deterioration, and wear and tear; and the application of roofing mastic suggested the roof was in a state of disrepair.  (*Id.*)  These reports gave Westminster reasonable bases for denying Covenant's claim.  *See Gethsemane FBH Church of God v. Nationwide Ins. Co.*, No. 19-cv-03677, 2020 WL 1694544, at *4 (E.D. Pa. Apr. 7, 2020) (granting summary judgment for insurer on bad faith claim where insurer based its denial on engineering report prepared by insurer's expert upon inspection of the property); *El Bor Corp. v. Fireman's Fund Ins. Co.*, 787 F. Supp. 2d 341, 349 (E.D. Pa. 2011) (granting insurer's motion for summary judgment on bad faith claim because insurer had reasonable bases

to deny claim where expert "found that the weight of the snow and ice could not have caused the damage to [the insured's] roof[] and noted the roof was poorly constructed and maintained").

As Covenant fails to point to any evidence from which a jury could clearly and convincingly find that Westminster lacked a reasonable basis for denying benefits and knew or recklessly disregarded its lack of a basis, the Court will grant Westminster's motion as to Covenant's bad faith claim.

## V. *Conclusion*

For the reasons discussed above, Westminster's motion for summary judgment will be granted in part and denied in part.

An appropriate Order follows.